# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

CITY OF ROCKWOOD, TENNESSEE,   )
      Plaintiff,   )
  )
v.   )       3:04-cv-410
  )
IMCO RECYCLING, INC.,   )
      Defendant.   )

## MEMORANDUM OPINION

This case came before the undersigned on September 2, 2005, for trial without a jury.

## NATURE OF CASE

This is an action by the plaintiff, City of Rockwood, Tennessee (Rockwood), for unjust enrichment. In a counteraction, the defendant, IMCO Recycling, Inc. (IMCO), contends that it is entitled to compensation for 3,518 dekatherms (Dth) of natural gas which it had delivered to Rockwood's utility division, Rockwood Water & Gas (RW&G), for which payment has not been made.

Rockwood is a municipality located in Roane County, Tennessee. RW&G serves Rockwood and the surrounding county with water, sewerage and natural gas services. IMCO is a Delaware corporation with its principal place of business in Irving, Texas.

After this action was initiated, IMCO merged with Commonwealth Aluminum, Inc., and the resulting company is Aleris International, Inc. (Aleris).

In 1995, IMCO signed a contract with plaintiff for the transportation of natural gas from regional gas pipeline companies through RW&G's pipeline to IMCO's Rockwood facility. IMCO nominated gas and had it delivered to East Tennessee Natural Gas Company (ETNGC), a gas transporter serving RW&G and surrounding utilities by pipeline, for placement in RW&G's account. The gas was then redelivered through RW&G's gas distribution system to IMCO's plant, with RW&G being paid a transportation fee for that service. The contract required RW&G to accept IMCO's deliveries of gas to the extent "operationally possible" and to redeliver the gas to IMCO when needed. The contract contained no balancing provision nor did it establish any type of banking arrangement.

In May 1998, RW&G submitted to IMCO a proposed new contract for the transportation of IMCO's natural gas. However, IMCO found the proposal's terms unacceptable and refused to sign it. According to IMCO, RW&G proposed a procedure for "cashing out" monthly imbalances that credited IMCO with a mere fraction of the value of gas delivered but not used in a particular month. The new contract also would have exacted substantial penalties for any gas redelivered by RW&G in excess of new deliveries by IMCO during the same month.[1]

---

[1]IMCO contends RW&G dropped the proposal after defendant indicated it was prepared to aggressively pursue alternative ways of getting gas to its facility.

Despite the failure to agree upon a new contract, RW&G terminated, effective December 31, 1999, the 1995 contract.[2]  In the absence of an agreement with regard to transportation of its gas, IMCO continued delivering gas to RW&G each month; RW&G accepted IMCO's deliveries without objection.  During the period April 1998 through June 1998, Woodward Marketing, LLC (Woodward) acted as IMCO's gas manager and transported gas to RW&G for IMCO.  In July 1998, Fellon-McCord & Associates (FMA)[3] began transporting gas for IMCO.  RW&G apparently billed IMCO monthly based not upon the amount of gas actually transported through plaintiff's system but upon the amount of gas IMCO had delivered to RW&G.  Plaintiff did not include any charges for imbalances in the amount of natural gas being delivered and redelivered.

During the period July 1998 through August 2003, IMCO had delivered to RW&G a total of 2,026,311 Dth of gas.  RW&G redelivered, and IMCO used, only 2,012,319 Dth.  After accounting for a possible imbalance of as much as 10,474 Dth carried into July 1998, the amount of gas IMCO had delivered to RW&G's system during the relevant period exceeded the amount of gas redelivered to IMCO by at least 3,518 Dth. Defendant argues that if the value of natural gas delivered and redelivered each month is reconciled monthly using the monthly average cash out prices posted by the Tennessee Gas Pipeline (TGP) during the relevant period, RW&G has been unjustly

---

[2]Plaintiff asserts that after March 1998, the parties had not operated under its terms.

[3]FMA is a consulting company.  The original commodity company that sells natural gas was called Alliance Energy.  It is now known as Constellation New Energy.

3

enriched and should pay IMCO $43,388.42 for the net difference in value of the gas IMCO had delivered to RW&G and the gas RW&G redelivered to IMCO.

Defendant submits that in order to recover for unjust enrichment, it is a prerequisite that there be no contract.  IMCO asserts that the parties had a contract for 1998 and 1999 providing for services.  Thereafter, the parties had invoices that were billed, reviewed and approved over a period of three and a half years.  Thus, defendant argues the course of performance establishes an "implied in fact" contract negating any basis for unjust enrichment.

According to defendant, in the months where IMCO over-delivered gas (*i.e.*, delivered more gas to RW&G than RW&G redelivered to IMCO), there was no "cost of gas" to be incurred by the utility.  In the months where IMCO under-delivered gas, while plaintiff claims the benefit derived by IMCO is to be measured by the value of the gas supplied by RW&G to make up the shortage, defendant contends the cost to plaintiff is not the proper measure.  *Simpson v.  Bicentennial Volunteers, Inc.*, 1999 WL 430497 at *2 (Tenn.  Ct.  App.  1999) ("The amount of recovery [for unjust enrichment] is the value of the benefit conferred not the cost to the furnisher").

Plaintiff notes that since April 1998, there was obviously a course of conduct between the parties, providing for a transportation agreement between IMCO and RW&G.  However, such agreement had nothing to do with "balancing" of gas.  Plaintiff asserts it has shown the proposed 1998 agreement was never approved, so there is

4

absolutely no contract with regard to the balancing of gas. Plaintiff further contends that during the months of April, May and June 2003, there is no dispute that IMCO under-nominated 9,448, 14,306 and 5,160 Dth of natural gas to be delivered to the city gate of Rockwood. RW&G claims that it had to pull the actual amount of gas used by IMCO out of its reserves, costing it over $5 per Dth to purchase. IMCO insists that if there was an imbalance over the period April 1998 through August 2003, any adjustment should be by volume and not by cost. Plaintiff argues such adjustment would lead to the inequitable result of balancing volumes of gas that cost $2 per Dth with volumes of gas that cost $6 per Dth.

Plaintiff asserts It has proved a benefit conferred upon IMCO and an appreciation by the defendant of such benefit. According to plaintiff, IMCO could not run the plant without gas, as it had to have gas to melt down the aluminum. Therefore, plaintiff seeks $94,000.

## REVIEW OF APPLICABLE AUTHORITIES

The requirements for recovery under an unjust enrichment theory are as follows: 1) there must be no existing, enforceable contract between the parties covering the same subject matter, *Robinson v. Durabilt Mfg. Co.*, 260 S.W.2d 174, 175 (1953); 2) the party seeking recovery must prove that it provided valuable goods and services, *Moyers v. Graham*, 83 Tenn. 57, 62 (1885); 3) the party to be charged must have received the goods and services, *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991); 4) the circumstances must indicate that the parties involved in the transaction

5

should have reasonably understood that the person providing the goods or services expected to be compensated, *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.*, 595 S.W.2d 474, 482 (Tenn. 1980); and (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. *Paschall's, Inc. v. Dozier*, 407 S.W.2d at 154. The doctrine of unjust enrichment is founded upon the principle that someone "receiving a benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so." *Id.* at 155. The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust. *Id.*

"The measure of compensation for unjust enrichment is based on the reasonable value of the services to be judged by the customs and practices prevailing in that type of business." *Lawler v. Zapletal*, 679 S.W.2d 950, 955 (Tenn. Ct. App. 1984), *quoting Chisolm v. Western Reserves Oil Co.*, 655 F.2d 94, 96 (6th Cir. 1981).

Contracts implied in law or quasi contracts are created by law without the parties' assent and are based on reason and justice. *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). Courts may impose a contract in law where no contract exists under various quasi contractual theories, including unjust enrichment. *Whitehaven Cmty Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998).

## <u>REVIEW OF EVIDENCE PRESENTED AT TRIAL</u>

6

Plaintiff's first witness was Rodney W. King, Jr. (King) of Rockwood, Tennessee, currently employed as the General Manager of RW&G. He testified that he graduated high school in Port Huron, Michigan, and then attended St. Clair Community College but did not receive a degree. King subsequently worked for Southeastern Michigan Gas, a publicly owned natural gas company in Port Huron. He then took a position with A&R Production, which later became Coastal Oil & Gas. King then started working as a consultant and contractor for American Resource Management (ARM), doing work for pipelines, utilities, and other such entities. Semco Energy (Semco) later bought out ARM, so he then took the job with RW&G. The witness noted that he has attended several technical schools for high pressure pipeline certification, has a water certification through the states of Tennessee and California, was a certified pipeline welder at one time, and is a member of several associations, such as the Tennessee Oil and Gas Association, Tennessee Gas Association and the American Public Gas Association. King testified that he has experience in construction and operation of gas pipelines, transportation and sales of gas, and running the financial end of a company. He indicated that while a consultant for TPSC, he had taken care of nominations and managed the flows, while also working with the financial staff. King indicated that he frequently attends educational seminars.

The witness noted that he had been a partner in ARM and had served as its Vice President of Operations. During his time with ARM, it had managed a gas field and a pipeline for Tennessee Pipeline and Storage Company (TPSC), actually producing gas to sell and getting it to market. The witness testified that King Energy and Construction

7

had been a part of ARM, with King as the Vice President of Construction for the Tennessee operations. Just prior to coming to work for RW&G, King also worked for Team Energy, another company he set up when he left Semco.

King was first hired at RW&G in January 2002, as an Operations Manager. In that position, he took care of the daily operations of a six million gallon-a-day water plant, a million gallon-a-day sewer plant, along with the natural gas operations. As an Operations Manager, King's duties did not include reviewing financial records and he had no authority or responsibility over the financial department which handled the invoices and nominations. After about six months on the job, in July 2002, he was elevated to the position of General Manager, where his additional duties included overseeing the financial department and reviewing all invoices, purchase orders and payables.

King noted the Rockwood utility is considered to be small, with approximately 2,750 natural gas customers, 1,800 sewer customers and approximately 3,600 water customers. In addition to residential users, the utility provides natural gas to both interruptible and noninterruptible industrial users. The "interruptibles" are the transport users, like IMCO, who acquire gas through a marketing agent or make nominations to a marketing agent. This purchased gas is delivered to RW&G, who then transports the gas through its system to the user's facility. RW&G would then charge a transportation fee.

8

Woodward basically managed RW&G's gas accounts, nominating gas to the major pipelines, purchasing gas and providing storage. According to King, Woodward was supposed to handle all of RW&G's nominations of the transport customers and work with other marketing companies. The other industrial customers of the utility included Bijou Steel, Horsehead Industries, Toho Carbon Fibers and ABA Health. IMCO's gas delivery agent was FMA.

In the gas business, King noted an imbalance results when an industrial customer nominates an amount to take into the system but then a different amount is actually used. As an example, a positive imbalance would mean that a company nominated 1000 Dth and only used 800, resulting in a positive imbalance of 200 Dth. The 200 Dth would arrive in plaintiff's system and become a part of it. A negative imbalance would result where a company nominated 1000 Dth, but used 1500 Dth. King stated that gas to cover the negative imbalance was provided by the utility from its reserves. He defined a dekatherm as a million BTU of gas.

The witness discussed the February 2003 invoice, which reflects usage by IMCO of 25,309 Dth of gas. He indicated that "usage" on the invoice actually meant "nomination," as the 25,309 Dth was the number that IMCO had nominated through Woodward. King noted that for any given month, it is unlikely that a customer would actually use the exact number nominated, but he had assumed Woodward was addressing the imbalances. However, while reviewing the April 2003 invoice in May 2003, King noticed IMCO's usage per the Woodward invoice was way down around five

9

to eight thousand dekatherms, while the actual amount of gas that had moved through RW&G's system to IMCO was much higher. In April 2003, while 3,150 Dth was nominated by IMCO, defendant actually used 12,598 Dth, resulting in a negative imbalance of 9,448 Dth. In May 2003, IMCO nominated 775 Dth but used 15,081 Dth, resulting in a significant negative imbalance of 14,306 Dth. In June 2003, IMCO nominated 9,900 Dth but utilized 15,060 Dth, leaving a negative imbalance of 5,160 Dth. According to the witness, the unit price for gas in April 2003 was $5.15, for May 2003, it was $5.96, and for June 2003, it was $5.95. King claimed the excess gas for use by IMCO had to be purchased by RW&G. Assuming the average was somewhere in the neighborhood of $5.50 per Dth with approximately 30,000 Dth under-nominated during the period, King asserted that more than $150,000 was lost by the utility. King noted that once he discovered the imbalance problem, he made phone calls to Woodward and wrote letters to FMA in an attempt to rectify the situation.

The witness stated that he is not certain of when IMCO officially stopped producing or transporting at its Rockwood facility, but RW&G shut off the gas to IMCO around August 2003. According to King, no one from IMCO or FMA ever informed RW&G in advance that the plant was shutting down. When questioned why he did not just shut off IMCO's gas supply once he learned in May 2003 of the significant under-nomination, King noted one reason was that IMCO was a major employer in the area and he did not want to arbitrarily shut off the customer's gas without getting all the facts.

10

The witness testified that a Rate 91 Transportation Service Agreement had been prepared by RW&G and apparently tendered to IMCO in 1998, but that no one from defendant ever signed the agreement. The proposal contained a provision to address monthly imbalances, requiring the utility and the transport customer to cash-out each month on the positive or negative imbalances.

King claimed RW&G did not have the ability to store gas within its system and had to contract with and pay a fee to an offsite storage company. RW&G would nominate some gas to be put into storage for use during the winter to help offset the high cost of gas during those months. As its agent, Woodward would make nominations with the storage company to take gas into storage or out of storage. RW&G would advise Woodward of its desire to make such nominations a month in advance. According to King, plaintiff paid a fee for storage and paid to have gas injected into or brought out of storage. King stressed that having the ability to store gas off-site added a substantial cost to the customers of the utility.

In addressing a letter from John McCord (McCord) of FMA, the witness expressed disagreement with McCord's statement that from the beginning of the relationship, FMA and IMCO had always understood that RW&G would allow any imbalance to be rolled over each month with a monthly charge of $0.30 per Dth billed for all gas used. The first paragraph of the letter reads as follows: "A written contract has never existed outlining how the balancing and charges were to be handled. From the beginning of this relationship, Fellon-McCord and IMCO have always understood

11

the agreement to be that Rockwood will allow an imbalance to be rolled over each month, and a monthly charge of $0.30 per dekatherm was to be charged for all gas consumed. This has been the agreement pursuant to various discussions between all parties involved and the mode of operation up until now." The letter further states as follows: "To view the whole picture, we would go back to 1998 and figure what a fair cash-out price would be for every single month, and figure out who owes whom money. In addition, during the last five years, the months where nominations were under IMCO's usage, Rockwood has never enforced any type of penalty for this. To do so retroactively is not in good faith." King claimed he was never aware of any such agreement to roll over gas imbalances and none of his predecessors ever advised him of such an agreement.

An exhibit prepared by the witness in late 2003 reflects "unit prices" and was used by plaintiff's expert to relate the damages claimed in the case. In preparation of the exhibit, King went through the invoices from April 1998 through August 2003, attempting to select the prices that best represented the "cost of gas to RW&G" on the particular dates. King argued that in the months where there was an over-nomination of gas, the utility would not have scheduled in advance to buy additional gas. For instance, in February 2003, 25,310 Dth were nominated by IMCO, but defendant only used 21,571 Dth, so a positive imbalance of 3,739 Dth resulted that month. King asserted that he could have left some of the utility's gas in storage if RW&G had known in advance that IMCO was going to over-nominate. He claimed RW&G did not want or need the excess gas from IMCO, and its presence in plaintiff's system resulted in

12

financial consequences to the utility. The witness further noted that if he would have

bought that gas, he would have purchased it at the $3.21 price range, as the utility had

contracted with its marketing agent for prices at that particular rate. Therefore, the cost

of the gas to plaintiff was not a higher price or the TGP average cash-out figure.

In April 2003, IMCO nominated 3,150 Dth, but consumed 12,598 Dth, resulting in

a negative imbalance of 9,448 Dth. King asserted that as a result of the under-

nomination, RW&G had to pay to obtain additional gas. To determine the cost of gas to

plaintiff in this instance, King used a gas price of $5.15, the spot market price for that

particular month. He did not use a lower price because RW&G's stored gas was put

back to benefit all RW&G customers and King believed it was improper to charge them

higher prices in order to provide gas to IMCO. As to all the invoices he reviewed, King

claimed he used the same procedures to select gas prices in over-nomination and

under-nomination months. He noted that the method he chose to price the gas did not

reflect the true economic impact on the utility, as RW&G had transportation,

administrative, storage, and other costs for which IMCO was not charged. King

contended that he had attempted to give IMCO the benefit of the doubt in all respects.

King recalled that in an attempt to resolve the imbalance issue, he had met with

Mark Mantooth (Mantooth) of IMCO at the City Hall in Rockwood. He also noted that

just prior to his discovery of the imbalance situation in May 2003, he had been

contacted by a couple from FMA who stated they needed to discuss IMCO's

nominations with him. Because he believed at that time that Woodward was handling such duties, he directed them to contact Woodward.

On cross, King admitted that prior to assuming his position with RW&G, he had never managed a public utility. He indicated that his prior experience was primarily in the construction of pipelines and the drilling of wells. Throughout the time he was trying to figure out the imbalance issue, King indicated that he did not discuss the matter with Mike Freeman, who had been the General Manager at the utility when the imbalances started occurring but were not billed. King admitted that he had no personal knowledge of what RW&G's expectations were in 1998, 1999, 2000 or 2001.

The witness noted that RW&G had been billing IMCO for transportation and the monthly invoice reflected the amount of gas that was transported through the utility's system for use by IMCO. Every month, he also received the invoice from Woodward that showed gas usage by IMCO. King admitted that if he had more closely scrutinized the monthly invoices, he would have realized earlier that the numbers RW&G had for usage were not the same as the numbers Woodward was reflecting. King stressed, however, that he had assumed Woodward was handling imbalances.

King noted the utility has a purchase plan where, from historical information, it knows approximately how much gas its customers will burn each month and purchases the required amounts of gas in advance. He indicated that Woodward had the authority to sell gas or place it in storage on the utility's behalf. A credit would appear on the

14

invoice if Woodward sold gas for plaintiff's benefit. Of his own personal knowledge, King did not know what happened to the gas at issue in this case. King stated that IMCO's gas would have come into plaintiff's system during a high burning season (March). According to the witness, if the gas was not sold and it was not put in storage, the utility must have burned the gas. At that time, RW&G already had a plan in place to buy any additional gas at $3.21. Accordingly, King claimed that if the utility burned any of "IMCO's" gas, defendant should get a credit of $3.21 per Dth. In his opinion, Woodward mishandled the matter.

The next witness for plaintiff was Robert Patterson, Sr. (Patterson) of Lenoir City, Tennessee, a graduate of the University of Tennessee with a degree in industrial management. A brief biographical sketch of his experiences in the natural gas industry was tendered to the court as an exhibit. Prior to his college graduation, Patterson had been employed by ETNGC, and he continued employment with that company after graduation from 1958 through 1991. At ETNGC, the witness noted that, position-wise, he began "at the bottom" as a Gas Control Dispatcher and advanced upward over the years. Patterson stated his last position had been Director of Marketing, in which he was responsible for customer contracts, billing and state/federal regulatory compliance. Additionally, he indicated service on various committees of the Tennessee Gas Association, American Public Gas Association, Southern Gas Association and the American Gas Association, along with the Federal Energy Regulatory Commission. After his retirement, Patterson began a consulting service for small utilities. Further, he has done consulting work for major pipelines and environmental firms.

15

Patterson testified that he has dealt previously with the issue of imbalances between users and suppliers of gas. The witness indicated that at ETNGC, he had been in charge of determining the procedures to be used in cases involving imbalances and that he had worked on the balancing provisions of the TGP system. Patterson was tendered by plaintiff as an expert in the field of natural gas marketing, customer relations, administration of rates, tariffs, gas transportation and adjustments of natural gas billings due to imbalances.

Patterson related that a transport customer has to nominate the volume of gas that it will be using. If its actual usage is different, plus or minus, from its nominations, then an imbalance results. He noted the industry standard is that imbalances will be cashed out each month. Patterson stated the reason for balancing out on a monthly basis is due to fluctuating gas prices. The witness noted that sometimes one may pay daily index, sometimes monthly index or sometimes fixed price. In the opinion of the witness, if in any given month there is an imbalance, it should be cashed out, whether it be over-nomination or under-nomination. According to Patterson, if there is an over-nomination, the customer should be paid for that gas; if there is an under-nomination, then the customer received gas it for which it should pay the utility.

Patterson noted that after review of the invoices in evidence from Woodward to RW&G between April 1998 and August 2003, he found no evidence indicating any banking arrangement. While Patterson indicated he was present when Mantooth testified at his deposition that IMCO and RW&G had a banking arrangement, the

16

witness reiterated that he could not find any evidence of such in the record. He related

that IMCO is asserting a cumulative or accumulated imbalance theory in its

counterclaim. According to the witness, the claim assumes one has the right to carry

forward imbalances from month to month. Patterson asserted that such an approach is

not consistent with gas industry customs and procedures. He noted the only reason

such an approach would be used would be in the event some customer had on-system

storage in which it could accommodate imbalances of a limited amount. As far as the

pipelines, Patterson claimed that none have any procedure for carrying forward

imbalances. He again opined that for an equitable resolution of this matter, the

imbalances should be cashed out at the cost of the gas for each month. The witness

noted that King had tried to be fair in his evaluation of what the gas costs to the utility

had been. Patterson indicated that based on his calculations, RW&G owes IMCO

$239,000 and IMCO owes RW&G $326,000. The result totals to $94,670 to the benefit

of plaintiff.

Patterson testified that the 1995 agreement between RW&G and IMCO was not

a transportation agreement, but an agreement by which RW&G allowed IMCO to

purchase gas in the Gulf and then deliver it into a pipeline for RW&G's account. The

utility then used its transportation and other gas services to deliver the gas to IMCO. He

reiterated that the agreement did not reflect any evidence of a banking arrangement.

He noted that according to the records he has reviewed, IMCO started transporting gas

on its own and RW&G continued to deliver the gas to IMCO.

17

On cross, Patterson stated that it is not the standard in the industry to cash-out imbalances on the "cost" of gas. He noted the industry standard exists to keep the nominations of transport customers as close to actual usage as possible. Patterson indicated that the customers have the right to change nominations on a daily basis in order to accomplish that goal.

Plaintiff read briefly from the deposition of Robert Ellis (Ellis), previously the Account Manager for RW&G's agent, Woodward, and currently the Senior Vice President of Marketing for Atmos Energy:[4]

> Q: "Now I understand you to say at the beginning of your testimony that typically if Rockwood over-nominated that the difference between what it nominated and what it burned went into storage. Is that correct?
>
> A: That is correct.
>
> Q: When it goes into – when Rockwood's gas goes into storage, the city is not charged for that gas by Woodward, correct?
>
> A: No. They are.
>
> Q: They are?
>
> A: Yes.
>
> Q: Okay. Would you – they are charged for IMCO's gas?
>
> A: No, they are charged for their gas that goes into storage, not IMCO's gas. Let me clarify. In the event that – in this scenario we have IMCO nominated more than they burned, correct?
>
> Q: Yes."

---

[4]Woodward was acquired by Atmos in 2001.

18

The first witness called by defendant was Mark Mantooth (Mantooth) of Aurora, Ohio. He is employed by Aleris, the company formed when IMCO merged with Commonwealth Aluminum, Inc. Mantooth noted that he had worked for either IMCO or Aleris for 13 years. He had previously worked for five years as an electrical engineer for ALCOA, the Aluminum Company of America after graduating from Tennessee Tech. Mantooth indicated that he started out at IMCO as a Maintenance Superintendent and was subsequently promoted to Plant Manager, General Manager and Division Manager. He is currently Director of Manufacturing, and works across the organization with all the facilities of Aleris.

The witness testified that operations at IMCO's Rockwood plant were the responsibility of the Plant Manager, who reported to Mantooth. From June 2002 until the plant was closed, Mantooth noted IMCO's plant received aluminum scrap that was processed through a rotary furnace, melted, and then transported in molten or ingot form. Natural gas was utilized to generate the heat to melt the aluminum. Mantooth stated that IMCO provided monthly nominations to FMA, who then procured the gas, arranged for its transportation through the pipelines, and helped IMCO with the distribution to the local gas company.

Mantooth reviewed the invoices and records for the period April 1998 through August 2003. He claimed IMCO transported a little over two million Dth into plaintiff's system during that time period and paid RW&G approximately $700,000 to transport its gas. Mantooth noted the first he knew of a problem with imbalances was from a

19

newspaper article quoting King regarding a purported disagreement. To his knowledge, no one at RW&G ever contacted anyone at IMCO prior to the newspaper article.

Mantooth indicated he had a role in deciding how much gas would be nominated for IMCO in 2003. During the months of December 2002, and January and February 2003, he stated there was much concern regarding limitations on gas delivery called "Operational Flow Orders" (OFOs). The witness indicated that an OFO limited IMCO to what it had nominated, so when an OFO was in place, IMCO intentionally put its nominations high in order that it could insure the delivery of gas. According to Mantooth, if IMCO's usage exceeded its nominations while under an OFO, heavy penalties would result.

Mantooth testified that the decision to close the Rockwood plant was essentially made around February 2003. IMCO knew that it had over-nominated in the prior months and that once the plant was shut down, gas consumption would be reduced significantly. According to the witness, because defendant believed a banking arrangement was in effect with RW&G, IMCO was determined to correct the imbalances to coincide with the closure of the plant. However, the plant stopped receiving gas near the end of August, when plaintiff's employees shut off the valve and locked it. Mantooth stated that IMCO still maintains a divisional office at Rockwood and had planned to use natural gas for hot water and heat at the facility. After the gas was shut off, IMCO brought in a propane tank and converted the water heater and heating systems.

After King complained about the imbalances, to gain a better understanding of what had transpired, Mantooth addressed the matter with FMA. He attended a meeting with RW&G, but asserted he did not at any time agree that IMCO owed any money to plaintiff. Mantooth noted that based on plaintiff's calculations, he could see how the utility arrived at the conclusion that IMCO owed it money, but stressed that it was not his position or his understanding technically that IMCO owed plaintiff money. He requested that FMA review how the imbalance situation had been addressed in the past and sought the history of nominations and actual usage. His conclusions were that IMCO had delivered more gas to plaintiff than it had received and, based on a monthly cash-out price, did not owe RW&G, but rather plaintiff owed IMCO. Mantooth claimed that based on the imbalance that occurred in any given month, if one took the monthly TGP cash-out price, the price associated with the overage or underage each month could be calculated.

As to an invoice from RW&G seeking an administrative charge of $505.50, the witness noted the utility had attempted to pass on to IMCO a charge Woodward was billing plaintiff. When defendant disputed paying the amount, arguing that it was a charge built into the utility's internal workings and that any assessment related to it should have been reflected in the base bill, the charge was ultimately dropped. Mantooth further testified that plaintiff's transportation charge for gas changed over time, starting at $0.30 and then going up to $0.44. After IMCO contested the validity of such a drastic increase and a cost of service analysis was conducted, the parties

agreed in 2000 on the charge of $0.37. That amount remained in effect until August 2003.

On cross, Mantooth took the position that RW&G owes IMCO 3,518 Dth of gas. The witness claimed it was his understanding that IMCO and plaintiff had a banking arrangement and, once IMCO had supplied the gas to plaintiff's system, it was available for redelivery. Mantooth stated his understanding was based on guidance from the Comptroller at that time, Kelly Smith, and through follow-up conversations with FMA. He noted that he did not discuss this purported banking arrangement with anyone at RW&G until the issue was raised by King.

The witness testified that IMCO has over 20 facilities in the United States, Mexico, Brazil and Europe. Mantooth noted that IMCO has banking arrangements in a couple of its facilities. It was his understanding that at two facilities, Coldwater (Aquila) and Lewisport, Kentucky, IMCO has cumulative imbalance arrangements where the volumes of gas are balanced month-to-month. He noted that with the Lewisport contract, the volumes must remain within a certain amount. The witness did not know whether the Lewisport plant has on-system storage. He indicated that at the Loudon IMCO plant, defendant balances out on a monthly basis in a cash-out arrangement.

As to the Aquila contract, the witness noted that it contains a monthly cash-out provision. He stated an amount is allowed for storage, but if the storage capacity is exceeded, then IMCO gets charged. By the same token, if IMCO takes out more from

22

storage than it puts in, it must pay for that gas. The witness indicated that while Patterson testified such an arrangement would require on-system storage, he believed that contractual arrangements for storage could serve the same function as on-site storage capacity.

The next witness for the defendant was Krista Newcom (Newcom) of Louisville, Kentucky, who works for Constellation New Energy Gas Division/FMA. She has worked with that company for almost six years, having joined it upon graduation from the University of Louisville, where she received a Bachelor's in Business Administration. Originally hired in October 1999, as an Analyst in the Gas Operations Department, she later was promoted to Assistant Manager. For about a six-month period, Newcom went to the consulting side of the business, the FMA aspect, where she was an Account Manager. Subsequently, the witness came back to the Gas Operations Department where she is currently a Manager.

Newcom noted that an Analyst in the Gas Operations Department has all of the contact with customers. The Analyst is responsible for obtaining nomination information from customers and communicating with the Supply Department to purchase the gas, coordinating with the Scheduling Department to get the gas to the pipelines or local utilities, and approving invoices on the customers' behalf. Newcom testified that an Assistant Manager was an overseer, responsible for monitoring the Analysts. She noted that an Assistant Manager is kind of a quality control resource for Analysts. As

the Manager, the witness indicated she is a resource to the Analysts and the Assistant Managers.

The witness related that from the time she was hired in October 1999 through March 2001, she had responsibility for managing the IMCO account.  After that, she intermittently had contact with it.  When she managed the account, Newcom noted she had communicated with the IMCO Plant Manager on a monthly basis to determine the nominations.  She would regularly receive meter readings from the Plant Manager and would compare usage on a daily basis to what FMA was nominating.  If she saw an imbalance, she would speak with the Plant Manager to figure out the best way to handle the matter.  Newcom would also review the gas invoices IMCO received from plaintiff, approve them, and then fax them back to the Plant Manager.

Newcom testified the daily amounts of nominations could be changed throughout the month.  She stated that while not all of the gas delivered to the Rockwood utility pursuant to the nominations was actually used by IMCO in the given month, FMA always invoiced IMCO for the total volume of gas nominated.

The witness noted that "daily flow reports" are documents FMA would prepare and send to IMCO.  The shaded areas of the flow reports indicated OFOs that had been issued, which essentially required that FMA's nominations exceed IMCO's usage for those days.  Newcom stated that for the winter of 2002/2003, there were substantially more OFOs than the previous winter.  She noted that out of a 60-day period, OFOs

24

were issued for 40 of those days.  If a nomination was below usage, substantial penalties could result.

According to Newcom, if nominated gas was not used by IMCO, it would remain in plaintiff's system and result in an imbalance.  Theoretically, it would go into RW&G's storage account, be sold, or go to the other customers of the utility.  Newcom stated her awareness of arrangements where imbalances are cashed out on a daily, monthly or annual basis.  She asserted the method of handling imbalances is up to the discretion of the utility.  In her experience, she had seen utilities set up a five or ten percent tolerance of an annual contracted quantity, monthly nomination or monthly usage.

Newcom testified that her understanding of the RW&G account was that if IMCO ever over-nominated, gas would be available for IMCO's use at a later date.  If IMCO under-nominated, the imbalance would be pulled from the prior months' over-nominations.  As a rule, she claimed FMA always maintained a positive imbalance so there would be gas from which to pull.  According to the witness, FMA did not seek credits for over-nominations because it was FMA's understanding that the gas was essentially held in a storage account for IMCO's use at a later date.  She noted that none of the invoices she received from plaintiff ever reflected a credit for over-nominated gas or a daily penalty for under-nominated gas.

The witness testified that in her experience, gas distribution services typically include balancing, and she has never known a utility and a customer to have separate

25

agreements for balancing and transportation.  She recalled that in February 2000, without warning, the transportation rate had increased from $0.30 per Dth of usage.  After a meeting between IMCO and RW&G, a cost of service study was requested by FMA to investigate whether the rate increase was truly warranted.  Subsequently, the $0.37 charge was agreed upon by the parties.  Later, an administrative charge was added by the plaintiff to its invoices.  It was her understanding that Woodward had been charging the utility the fee for several months, so plaintiff had decided to pass the charge along to IMCO.  Newcom stated FMA did not approve of the charge, believing the cost of service included any cost incurred from Woodward, and refused to pay it.

The witness helped prepare an exhibit to illustrate monthly cash-outs on the IMCO account.  FMA chose the TGP average cash-out price.  If IMCO had over-nominated, she took the TGP average cash-out price to calculate what plaintiff hypothetically owed IMCO.  She noted that the TGP average cash-out figure represents the weighted average of market pricing.  According to the witness, the cumulative imbalance shown at the end of August 2003 was a positive 3,518 Dth.

Newcom noted that Mamie Jones Finewood (Finewood) had actually been responsible for managing the IMCO account in 2003.  While Finewood was on vacation the last week of March, it had been brought to Newcom's attention by the Supply Department that the nomination entered by Finewood was significantly lower than what FMA would typically nominate on IMCO's behalf.  Newcom and Brian Franz, Director of FMA's Supply Department, called RW&G to verify what the cumulative imbalance was.

26

They spoke to King about the situation, but he referred them to Woodward. They contacted Woodward and sought to speak to Ellis, but were unsuccessful. Eventually, they spoke with an individual named Tucker and alerted him to the fact that FMA wanted to under-nominate for April 2003. He told them he would have to look into the matter and get back to them. However, FMA never heard back from Tucker or anyone from Woodward. In the absence of guidance from Woodward, FMA proceeded to under-nominate.

Newcom indicated that she heard Patterson state plaintiff would need to know a month in advance in order to inject gas into storage. She claimed it was her experience that if a nomination exceeded usage, there would be opportunities throughout the month to inject gas into storage. The witness asserted that she was not aware of a situation where one would have to give that nomination into storage months ahead of time.

Newcom noted the Aquila contract involved a cash-out provision that allowed the customer to carry an imbalance from month-to-month so long as it did not exceed the specified tolerance. However, if the volume exceeded the set tolerance level, then the cash-out provisions were put into effect. To Newcom's knowledge, no specific tolerance agreement existed between IMCO and plaintiff.

On cross, Newcom testified that the flow reports were internal to FMA and never given to RW&G. The witness noted that personally, she had not handled other accounts without tolerances specified. Since her deposition, she had learned of another

such account, but it is more of an agreement between the customer and the utility to keep the imbalances within a reasonable amount with no specific tolerance set forth. At the time of her deposition, Newcom had stated the account at issue was "one-of-a-kind" because it had no set parameters. She testified that FMA would use "buy back" sales credits to keep IMCO's actual usage of gas in reasonable alignment with its nominations. By that method, FMA would sell gas back into the market and issue a credit to IMCO's invoice. She indicated that the total FMA invoiced was IMCO's nomination, not its usage.

Newcom noted that when she first started with FMA, it was her understanding that IMCO was operating under an agreement without set tolerances, but which stated the volume delivered to RW&G would be available for redelivery to IMCO at a later date. She considered the arrangement to be banking. Newcom indicated that she did not know firsthand of any actual gas that went into storage or whether RW&G had on-system storage. She stated that given the fact IMCO delivered gas to plaintiff that was never used, it would appear IMCO paid for gas that went into RW&G's storage. Newcom does not recall any specific discussions with anyone at IMCO about carrying over imbalances of gas by volume on a month-to-month basis or any banking arrangement. She indicated the flow reports that FMA provided to IMCO monthly always showed the imbalances.

The witness discussed the TGP average cash-out number and admitted it did not take into account the fact that RW&G had gas under contract for various prices.

28

Newcom was unaware if plaintiff had the ability to market gas and did not know if RW&G had to give notice before injecting gas into or removing gas from storage. Newcom claimed that because IMCO had previously delivered excess gas to plaintiff, if IMCO used more than it had nominated for a month, gas should have been available for IMCO to use. She did not believe plaintiff was required to obtain more gas in those situations.

On redirect, Newcom noted that the nomination for September would have been made the last week of August by the last business day. Because RW&G shut off the gas before that date, the utility had not so acted because it had not received the nomination.

Defendant read into evidence a portion of the deposition of King taken on July 11th, 2003:

> Q: "Prior to the termination of the Woodward contract did you have any rights to audit that contract, and by you I mean Rockwood?
>
> A: The Woodward Marketing agreement?
>
> Q: Yes, sir. Did you have any rights under that agreement to have what they were doing on your behalf audited?
>
> A: I am sure we did. I never really read this thing from cover to cover.
>
> Q: Did you, Rockwood, exercise those rights to have Woodward's performance audited?
>
> A: We exercised our rights to have some of the invoices audited, yes.
>
> Q: Who did the audit for you?

29

A:  RSCM Corporation.

Q:  Did they do that audit from your records or did they go to Woodward and look at Woodward's records?

A:  I believe they took the records we gave them and tried to reconcile the invoices.

Q:  Have any adjustments been made to Woodward's invoices to you as a result of those audits or otherwise?

A:  There has been adjustments made to their invoices, yes.
Q:  Has compensation passed back and forth one way or another, as a result of the adjustments?

A:  Yes.

Q:  Were the adjustments mutually agreed upon?

A:  I would guess so.

Q:  When were the adjustments made?  Not when were they proposed.  Well, let me back up.  Did you propose that the invoices be adjusted, you, Rockwood?

A:  Correct.

Q:  And as I understand it, the invoices were eventually adjusted?

A:  I believe some of them were.

Q:  Do you know any particular months that were adjusted?

A:  That is the problem, getting lost in my years right now, but it was October through December, sometime in that period.  It might have been December 2003 or 2004.

Q:  What was the problem that you thought required adjustments?  Did it pertain to IMCO's nominations?

A:  I would have to look at those invoices and tell you for sure, but it could have been a result of that, yes.  I will clarify that.  It could be IMCO or the other gas transportation customers.

Q: I understand that. What was the total amount of the adjustment received by Rockwood from Woodward?

A: I would have to go back and look at the financial on that to tell you the exact numbers.

Q: Well, I don't need to the nearest penny, sir. Was it over 50,000 or less than 50,000? To the best of my recollection it was over $50,000.

A: That is where I get fuzzy. I can't recall if it was over a hundred or not — in that area."

Defendant also read a portion of the deposition of Ellis:

A: "Well, let me just explain broadly how the balancing between Rockwood and Atmos occurred. On a seasonal basis, Atmos generated a plan, a purchase plan. Typically we did this for April through October time period, which is injection period or injection cycle. And then we would also generate a winter plan in October for the November through March time period.

In those plans we projected what the usage for the City of Rockwood would be based on historical averages and we bought flowing supply according to those historical averages on that plan. And the way the imbalances worked pertaining to Rockwood buying or selling imbalances, any overage or underage over – any variation from the plan which was based on historical average simply was injected to or withdrawn from storage so there was no buying or selling of imbalance gas by Rockwood.

Q: Would that be true of all Rockwood's customers or simply IMCO?

A: Well, that specifically, the answer I just gave you was specifically for Rockwood, for Rockwood's supply. By default, any delta between IMCO's nominated volume by their third party agent, any delta between what they nominated and what they burned automatically fell out into Rockwood's imbalance that was then in turn injected or withdrawn into storage."

Defendant read another portion of Ellis' deposition:

A: "Let me just explain the nature of the storage. Nature acts as a shock absorber because there is no way on any different day we can project

exactly the amount of gas the City of Rockwood will burn because temperatures vary, people's thermostats vary. You know, it's just impossible to exactly project how much gas they're going to burn on a day-to-day basis. so what we do is we use historical averages to get within a reasonable range of what we think they're going to use and the storage acts as a shock absorber plus or minus. So if we thought they were going to burn 5,000 and it wound up being colder than expected and they burned 6,000, that incremental piece was withdrawn from storage. And on the opposite side, if we thought we were going to burn 5,000 and they actually burned 4,000, that incremental thousand went into their storage.

And because IMCO was not being cashed out, that gas, that incremental gas *per se* was being aggregated with Rockwood's imbalance and either going into Rockwood's storage or coming out of Rockwood storage on a monthly basis to balance the meter."

32

**FINDINGS OF FACT**

1.  IMCO operated an aluminum recycling plant in Rockwood, Tennessee.  At the facility, IMCO received aluminum scrap, melted it, and then delivered the recycled aluminum to its customers in molten form or in ingots.  The heat used to melt the scrap aluminum was generated by burning natural gas.

2.  RW&G operates a gas distribution system serving approximately 2,750 customers in the Rockwood area.  Most of its customers purchase their gas from Rockwood, but some commercial customers do not.  These entities, such as IMCO, are known as "transport" customers.  They procure their own gas and then pay RW&G to transport the gas through plaintiff's system to their facilities.

3.  RW&G's agent for gas management was Woodward until plaintiff terminated its services on March 31, 2004.  Under their Gas Sales Agreement, Woodward sold gas to RW&G, nominated gas for the utility and arranged for transportation and delivery of gas to Rockwood's city gate on a monthly basis, coordinated storage of gas for plaintiff at locations not on RW&G's system and handled monthly nominations of gas by plaintiff's industrial users.

4.  Through Woodward, FMA made IMCO's monthly nominations of gas to RW&G.  On a daily basis, FMA received manual meter readings from plant personnel at IMCO's facility.  These meter readings were compared with the amount of gas nominated for the month in order to gauge the volume of gas being used by IMCO and

33

to keep track of any imbalances.  FMA billed IMCO for its monthly nominations of gas and IMCO paid FMA for gas on that basis.

5.  "Nominations" of gas are advance notices to pipelines and local distribution companies of the amount of gas being delivered for transport.  Nominations are typically made for a month at a time but can be changed during the month.

6.  Effective January 1, 1996, IMCO and RW&G entered into a written agreement pursuant to which plaintiff agreed to provide "gas services" to IMCO (Gas Service Letter Agreement) (dated September 19, 1995).  The Gas Service Letter Agreement stated that, "All natural gas, transportation and distribution services provided to IMCO shall be firm."  RW&G agreed to allow IMCO to purchase natural gas for delivery to Rockwood's city gate.  The gas was delivered to one of two interstate pipeline companies (Gas Transporters) and RW&G arranged with them to deliver the gas to the city gate.  RW&G then transported the gas to IMCO's facility through its distribution system.  IMCO agreed to reimburse plaintiff for what RW&G paid to the Gas Transporters to move IMCO's gas to the city gate and for plaintiff's services in delivering the gas to IMCO's plant.  The Gas Service Letter Agreement was not formally terminated until December 31, 1999, but the parties did not operate under its terms after March 1998.

7.  During the period April 1998 through June 1998, Woodward acted as IMCO's gas manager and transported gas to Rockwood's city gate for defendant.  IMCO became solely a gas transportation customer of RW&G at this point.  Effective July 1,

34

1998, however, Woodward's services were terminated and IMCO hired FMA as its agent for gas management. It appears Woodward had put IMCO's account with RW&G into a 10,474 Dth under-nomination situation. As IMCO's gas manager, FMA procured the natural gas required by the facility and arranged for its transportation through the interstate gas pipelines and local distribution companies. FMA billed IMCO for gas, not RW&G. No written contract for the transportation of gas between plaintiff and IMCO now existed. The conduct of the parties at this point establishes that the Gas Service Letter Agreement had been rescinded in March 1998.

8. In early 1998, plaintiff proposed a new agreement that would have "cashed out" imbalances between IMCO's nominations and usage on a monthly basis. IMCO, however, expressed opposition to "cashing out imbalances." Defendant noted that the Gas Service Letter Agreement could only be terminated at year's end, after 90 days' written notice. As it was already too late to terminate the Gas Service Letter Agreement in 1998, IMCO stated it expected the contract to continue until December 31, 1999. In March 1999, RW&G gave notice to IMCO that the Gas Service Letter Agreement would be terminated effective December 31, 1999. The reason given for the termination was that RW&G's contracts with the Gas Transporters were up for renegotiation.

9. Because IMCO was not being cashed out, Woodward aggregated the imbalances due to IMCO with any imbalances between plaintiff's nominations and usage, with the net amount either going into or coming out of RW&G's storage on a monthly basis to "balance the meter." RW&G paid for the gas which Woodward put into

35

storage for it.  Plaintiff also paid a fee for gas storage off its own system and was charged to have gas injected into or brought out of storage.  When RW&G "redelivered" gas to defendant in months of under-nomination, RW&G was delivering RW&G's gas for which it had paid.

10.  In February 2000, RW&G attempted to increase its price to IMCO from $0.30 per Dth to $0.44 per Dth.  However, IMCO did not agree to the increase.  After plaintiff agreed to perform a cost of service study to justify the increase, the parties negotiated a $0.37 per Dth fee for RW&G's gas services.  That rate was applicable from 2000, until gas services ended in August 2003.

11.  IMCO forwarded the bills it received from RW&G to FMA for compliance review.  In 2002, plaintiff began adding to its bills an "administrative fee" that it was being charged by Woodward for handling IMCO's nominations.  This charge was disapproved by FMA and the parties met to resolve the matter.  After IMCO asserted that Woodward's "administrative fee" was included in the $0.37 transportation charge negotiated in 2000, plaintiff agreed to withdraw it.

12.  An OFO is an order issued by the interstate gas pipeline company, here ETNGC, that essentially requires usage not exceed nominations on a particular day of high volume.  When confronted with an OFO, IMCO and FMA would increase the amount of gas nominated so as to insure that IMCO's usage did not inadvertently exceed its nomination.  An unusually high number of OFOs in the winter of 2002/2003

36

resulted in significantly more gas being delivered for IMCO than defendant actually used. In the months of December 2002 and January 2003 through March 2003, IMCO over-nominated more than 29,000 Dth of gas, thus causing extra gas to be delivered to Rockwood's city gate. RW&G had a seasonal gas purchase plan with Woodward, where the agent bought gas for plaintiff according to historical averages, so plaintiff did not need the excess gas. RW&G calculated the value conferred on it by IMCO was the price at which RW&G could have purchased gas from Woodward had it needed gas.

13. In April through June 2003, FMA under-nominated IMCO's gas by almost 29,000 Dth of gas. This event was quite disruptive to plaintiff's gas operations and cost rate payers over $150,000. RW&G was forced to purchase gas to cover the under-nominations. Plaintiff argues the value of the benefit it conferred on IMCO was the index or spot market price which RW&G had to pay for the gas.

14. In March 2003, Krista Newcom, an FMA employee, contacted plaintiff to discuss the IMCO situation, but was referred by King to Woodward. The person with whom she spoke at Woodward said he would have to look into the issue and get back to her, but never returned the call. In the absence of an objection, FMA went ahead with the under-nominations in April, May and June.

15. RW&G discovered the imbalances were not being handled properly in May 2003.

16. During the period July 1998 through August 2003, IMCO nominated 2,026,311 Dth of gas to plaintiff, who redelivered 2,012,319 Dth of gas to IMCO, resulting in a net over-delivery by IMCO of 13,992 Dth. IMCO had carried a negative imbalance of 10,474 Dth into July 1998. Thus, over the course of their relationship, IMCO delivered 3,518 Dth of gas to RW&G that plaintiff never redelivered to IMCO. None of the monthly invoices from plaintiff for the relevant period reflect any credits to IMCO for the excess gas delivered. Nor do the monthly invoices reveal any charges for under-nominations by defendant. In August 2003, plaintiff closed the gas line to IMCO's plant, thus cutting off IMCO's access. The average market value of gas in August 2003 was $4.8819 per Dth.

17. Around June 30, 2003, IMCO asked FMA to investigate whether the time differential between delivery of gas to plaintiff as compared to redelivery had worked to the disadvantage of RW&G. Newcom performed the analysis, using the TGP average gas cash-out price as the measure of the market price. The TGP average cash-out price is a weighted average of the market price for gas in the market in which plaintiff is located. The TGP average cash-out price for any given month would be the same, regardless of whether the gas being valued was over-nominated or under-nominated. Newcom's report showed the value of the excess gas delivered by IMCO - measured at the time it was delivered - exceeded by $43,545.94 the value of gas supplied by plaintiff to make up for under-nominations – measured at the time it was delivered – for the period from July 1998 through August 2003. Of that $43,545.94, $20,255.67 (10,474 Dth times $1.9339 per Dth) is attributable to over-nominated gas delivered by IMCO in

38

July 1998 to eliminate the negative imbalance carried into that month. Taking that into account, by the defendant's calculation, the value of over-nominated gas delivered by IMCO to plaintiff still exceeded by $23,290.27 the value of gas supplied by RW&G to make up for under-nominated gas.

18. In a letter dated July 21, 2003, addressed to RW&G's King, McCord of FMA stated as follows:

> As you may, or may not be aware, Fellon-McCord & Associates, Inc./Alliance Energy Services, LLC (Fellon-McCord) has been transporting natural gas to IMCO since July 1998. A written contract has never existed outlining how the balancing and charges were to be handled. From the beginning of this relationship, Fellon-McCord and IMCO have always understood the agreement to be that [RW&G] will allow an imbalance to be rolled over each month and a monthly charge of $0.30 per decatherm was to be charged for all gas consumed. This has been the agreement pursuant to various discussions between all parties involved and the mode of operation up until now.

McCord further noted in the letter:

> To view the whole picture, we would go back to 1998 and figure what a fair [cash-out] price would be for every single month, and figure out who owes whom money. In addition, during the last five years, the months where nominations were under IMCO's usage, Rockwood has never enforced any type of penalty for this. To do so retroactively is not in good faith.

As admitted by McCord, no written contract existed outlining how the balancing and charges were to be handled. RW&G proposed such a contract, but IMCO rejected it.

19. IMCO's witnesses could not identify anyone at RW&G or Woodward with whom they spoke about such a rollover agreement whereby gas could be "banked" for

later use by IMCO.  Significantly, plaintiff had no ability to store gas within its system.

RW&G subscribed to off-system storage and paid a subscription fee for the service as

well as a charge for injecting gas into storage or bringing it out of storage.  Further,

RW&G paid Woodward for the gas which went into storage.  Thus, monthly "banking" of

gas for defendant would have posed significant financial consequences to plaintiff.

20.  According to plaintiff's expert, such a "banking" or "roll over" arrangement

would be completely at odds with gas industry customs and procedures.  Additionally,

Woodward's Ellis indicated that RW&G was not providing gas "banking" services for

IMCO and he was not aware of any gas delivery arrangement that would allow no

tolerance carry over of gas volume imbalances on a monthly basis.  Woodward did not

discuss any type of banking arrangement with IMCO, FMA or RW&G.  Every gas

distribution system with which Ellis was familiar has a cash-out provision at the end of

each month or there is a five percent tolerance with a cash-out provision.

21.  No penalties are claimed and RW&G has proved what a fair cash-out price is

for every month between April 1998 and August 2003, when the plant shut down.  The

parties have stipulated the nomination and usage numbers for all of these months and

both King and plaintiff's expert have convincingly explained why the "RW&G Cost of

Gas" figures represent the values conferred on either party in given months.  The total

benefit conferred on IMCO by RW&G for the period of April 1998, through August 2003,

is $94,670.

## CONCLUSIONS OF LAW

1. Plaintiff has met the threshold requirement for an unjust enrichment claim related to the imbalances, as there is no existing, enforceable contract between the parties covering the same subject. *CPB Management, Inc. v. Everly*, 939 S.W.2d 78, 81 (Tenn. App. 1997). After March 1998, there was no existing enforceable contract between IMCO and RW&G regarding the handling of imbalances.

2. RW&G has no contractual or other remedy against IMCO except unjust enrichment.

3. RW&G has proved every element of its claim of unjust enrichment and has proved that it conferred a benefit on IMCO in the amount of at least $94,670. There was appreciation by IMCO of the benefit conferred. *See Paschall's, Inc.*, 407 S.W.2d at 155. IMCO could not operate its plant without natural gas. Woodward's Ellis testified that plaintiff was not providing gas "banking" services for IMCO and he was unaware of any gas delivery arrangement that would allow no tolerance carry over of volume imbalances on a monthly basis. There was never any agreement that plaintiff would allow imbalances to be "banked" and "rolled over" each month.

4. It would be inequitable for IMCO to retain the net benefit conferred on it without repayment. IMCO's under-nominations, especially during the months of April, May and June 2003, imposed a considerable financial hardship on plaintiff's utility.

5.  "The measure of compensation for unjust enrichment is based on the reasonable value of the services to be judged by the customs and practices prevailing in that type of business." *Lawler v. Zapletal*, 679 S.W.2d 950, 955 (Tenn. Ct. App. 1984), *quoting Chisolm v. Western Reserves Oil Co.*, 655 F.2d 94, 96 (6th Cir. 1981). IMCO's own agent, FMA, speaking through McCord, agreed that "[t]o view the whole picture, we would go back to 1998 and figure out what a fair cash out price would be for every single month, and figure out who owes whom money." Through its expert, plaintiff established that the custom and practice of the gas industry is to adjust monthly imbalances based on cashing out unless there is some agreed upon banking of volumes up to a predetermined limit. Significantly, RW&G has not attempted to recover prejudgment interest, penalties, transportation costs, administrative costs and storage costs, and IMCO has been given the benefit of the doubt in the calculations which show that it has been unjustly enriched. The total benefit conferred on IMCO by RW&G for the period of April 1998, through August 2003, is $94,670.00, and RW&G is entitled to judgment in that amount.

6.  IMCO's counterclaim is dismissed. The claim is based on a theory of unjust enrichment, but there was no understanding between IMCO and RW&G that monthly imbalances could be carried over by volume with no tolerances or limitations. The proof shows such an agreement would be contrary to industry customs and procedures as well as unjust. IMCO has not proved that RW&G had a benefit conferred on it which it desired to have conferred on it. Thus, RW&G has not been unjustly enriched.

42

**ORDER TO FOLLOW.**

**ENTER:**


_____s/Thomas W.  Phillips_____
**UNITED STATES DISTRICT JUDGE**

43